******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# ROBIN HOHORST *v.* TOWN OF EASTON ET AL.
## (AC 47671)

Cradle, C. J., and Westbrook and Bishop, Js.

*Syllabus*

The plaintiff homeowner appealed from the trial court's judgment granting the defendants' separate motions for summary judgment in her action sounding in negligence and nuisance. She alleged that the defendant town, which held two storm drain easements on her property, and the defendant water company, A Co., were liable for the damages the property sustained as a result of flooding during a heavy rainstorm. The plaintiff claimed, inter alia, that the court erred in concluding that her claims against the town were barred by governmental immunity. *Held*:

The trial court properly determined that the town was entitled to summary judgment as to the plaintiff's negligence claim, as the manner in which the town was to discharge its duty to maintain the storm drain easements involved the exercise of judgment and discretion, and, therefore, was discretionary in nature, and, as such, did not abrogate the town's governmental immunity.

The trial court improperly granted the town's motion for summary judgment as to the plaintiff's nuisance claim on the ground that it was barred by governmental immunity, as, on the basis of the materials presented to the court, there was a genuine issue of material fact regarding whether the town, by positive act, either created or participated in creating a nuisance resulting in damage to the plaintiff.

The trial court improperly granted the town's motion for summary judgment as to the plaintiff's nuisance claim on the alternative ground that it was time barred by the statute of limitations (§ 52-577), as the town waived its statute of limitations defense by having failed to plead it.

The trial court properly granted A Co.'s motion for summary judgment, as there were no genuine issues of material fact as to whether A Co.'s conduct contributed to the flooding of the plaintiff's property on the day of the storm.

This court declined to review the plaintiff's claim that the trial court abused its discretion in denying her motion for reconsideration of the granting of A Co.'s motion for summary judgment, as this court concluded that the trial court properly granted that motion.

Argued September 2, 2025—officially released February 17, 2026

*Procedural History*

Action to recover damages for, inter alia, negligence, and for other relief, brought to the Superior Court in the judicial district of Fairfield, where the court, *Clark, J.*, granted the motion for summary judgment filed by the

defendant Aquarion Water Company; thereafter, the court, *Clark, J.*, granted the named defendant's motion for summary judgment; judgment for the defendants; subsequently, the court denied the plaintiff's motion for reconsideration, and the plaintiff appealed to this court. *Reversed in part*; *further proceedings*.

*John C. Turner*, *Jr.*, for the appellant (plaintiff).

*Alan R. Dembiczak*, for the appellee (named defendant).

*Thomas M. Noniewicz*, for the appellee (defendant Aquarion Water Company).

*Opinion*

BISHOP, J. This appeal arises out of an action by the plaintiff, Robin Hohorst, in which she alleges that the defendants, the town of Easton (town) and Aquarion Water Company, also known as Aquarion Water Company of Connecticut (Aquarion), are liable for damage to her residential property caused by flooding on September 25, 2018. The plaintiff appeals from the trial court's judgment granting separate motions for summary judgment filed by each defendant, and from its denial of her "motion for reargument/reconsideration" of the order granting summary judgment in favor of Aquarion. On appeal, the plaintiff claims that the court improperly rendered summary judgment in favor of the town because it erroneously concluded that her negligence and nuisance claims were barred by governmental immunity and that her nuisance claim also was barred by the statute of limitations set forth in General Statutes § 52-577. She further claims that the court improperly rendered summary judgment in favor of Aquarion because it erroneously concluded that there were no genuine issues of material fact as to whether Aquarion's conduct contributed to the flooding of her property, and that it abused its discretion when it denied her motion for reargument. We reverse the judgment of the trial court as to the plaintiff's nuisance claim against the town, and we affirm the judgment in all other respects.

The record before the court, viewed in the light most favorable to the plaintiff as the nonmoving party on the prevailing motions for summary judgment, reveals the following facts and procedural history. The plaintiff owns and resides in a home located in the town at 60 Ferndale Drive (property). The property is part of a watershed,[1] and it is subject to two storm drainage easements that were granted to the town before the plaintiff purchased the property in March, 1993. Aquarion is the public water supply company that provides water service to the town.

On September 25, 2018, a storm system that dropped a significant amount of rain during a short period of time passed through the town. Nearly six inches of rain fell onto the watershed area where the property is located, and flash flooding occurred. The town's drainage system was overwhelmed by the excessive surge of water and could not contain it. More specifically, the capacity of the catch basins and pipes at the neighboring intersection of Marsh Road and Morningside Road, where the watershed culminates, was exceeded, and overland flooding onto the property occurred. This flooding destroyed the plaintiff's driveway and ruined the basement of her home.

The plaintiff commenced this litigation in July, 2019. The second amended complaint was filed on April 13, 2021, and it contained three counts. Counts one and two were brought against the town and sounded in negligence

---

[1] Our research has revealed that "[n]o generally accepted definition of watershed exists beyond the merely geographical notion that a watershed is an area drained by a river or stream." G. Coggins, "Watershed as a Public Natural Resource on the Federal Lands," 11 Va. Envtl. L.J. 1, 1 (1991). "According to one court, a watershed 'is the whole gathering ground of a river system; i.e., the geographic area from which any river or creek draws its flow. The New Shorter Oxford English Dictionary 3636 (Thumb Index ed. 1993).' *Lands Council* v. *Powell*, 395 F.3d 1019, 1024 n.1 (9th Cir. 2005)." R. Glicksman, Public Natural Resources Law (2d Ed. 2025) § 35:1 n.3. The plaintiff's expert, Robert J. Wheway, a licensed professional engineer, testified at his deposition that "[a] watershed would be representative of the water as it falls from the sky, lands on the ground, the containment of that water and where it would ultimately discharge to."

and nuisance, respectively. Count three was brought against Aquarion and sounded in negligence. In count one, the plaintiff alleged that the flooding of her property occurred as a result of the town's negligence in failing (1) to properly maintain the two storm drainage easements that ran through the property and (2) to properly construct, design and/or maintain the catch basins and drainage system at the Morningside Road and Marsh Road intersection, which sits to the north of the property. She further alleged that the town's duties in these regards "were ministerial in nature." In count two, the plaintiff alleged that the flooding occurred as a result of a nuisance that the town affirmatively created by diverting a "tremendous amount" of water into the improperly maintained easements and failing to "properly design and maintain the catch basins at the corner of Morningside Road and Marsh Road." Finally, in count three, the plaintiff alleged that the flooding occurred as a result of Aquarion's negligence in failing (1) to properly maintain the town reservoirs it owned or controlled so as "to ensure the proper amount of water was released and conveyed through the watershed" during the September 25, 2018 storm, (2) "to adequately and properly maintain the water flow and supply to [town] residents . . ." and (3) "to act in a reasonably prudent manner given the dangerous conditions caused by the . . . rainstorm in the area."

On May 6, 2021, Aquarion filed a request to revise the second amended complaint which sought to have the plaintiff offer more specificity as to the allegations against it. The court, *Jacobs*, *J.*, granted Aquarion's request, and the plaintiff filed a revised complaint on October 1, 2021. On October 7, 2021, the town filed an answer to the revised complaint in which it raised several special defenses, including common-law and statutory governmental immunity as to counts one and two. The town did not, however, raise a statute of limitations special defense to the plaintiff's nuisance claim.

On April 14, 2023, Aquarion filed a motion for summary judgment as to count three of the second amended

complaint and a memorandum of law in support of that motion.[2] It attached three exhibits to the memorandum of law: **(1)** a report prepared by the plaintiff's expert, Robert J. Wheway; see footnote 1 of this opinion; regarding his investigation into the cause of the September 25, 2018 flooding (Wheway report);[3] **(2)** a copy of the transcript of Wheway's deposition; and **(3)** a sworn affidavit by Robert "Jeff" Ulrich, who was employed by Aquarion as vice president of Connecticut operations. Aquarion argued that it was entitled to summary judgment as a matter of law because, on the basis of the allegations and evidence presented, no reasonable fact finder could determine that Aquarion "cause[d] or ha[d] any role in the plaintiff's water damage incurred in [the] flooding on September 25, 2018."

Aquarion highlighted the opinions set forth in the Wheway report, which "refer to faults in the design, installation and maintenance of the [town's] drainage system," and emphasized that the report does not mention Aquarion at all. Further, it recounted that, when asked at his deposition if he had any opinions as to whether Aquarion bore any responsibility for the flooding, Wheway testified that he had not "seen any indication with regards to the storm of [September 25, 2018] being

[2] Although Aquarion's motion for summary judgment references the second amended complaint dated April 13, 2021, the October 7, 2021 revised complaint was the operative complaint at the time Aquarion filed its motion for summary judgment. We discern no appreciable distinction between these iterations of the complaint insofar as Aquarion and its motion for summary judgment are concerned; see, e.g., *Metropolitan District* v. *Mott*, 235 Conn. App. 449, 463, 346 A.3d 1064 (2025) ("[i]t is well established that the interpretation of pleadings is always a question of law for the court" (internal quotation marks omitted)); and no party has claimed otherwise in this appeal. We also note that the record does not reflect that Aquarion filed an answer to any iteration of the plaintiff's complaint before filing its motion for summary judgment, but further recognize that it is well established that the pleadings need not be closed prior to doing so. See Practice Book § 17-44; *Emmerson* v. *Super 8 Motel-Stamford*, 59 Conn. App. 462, 468–69, 757 A.2d 651 (2000).

[3] Four watershed maps and three arial photographs of the area in which the property is located, from different years, are included in the Wheway report.

attributable to Aquarion." He also testified that, based on his research, all of the reservoirs Aquarion controlled in the town sat at elevations "below" the property. Finally, Aquarion posited that Ulrich's affidavit established that none of the water that flooded the plaintiff's property could be linked to Aquarion. Specifically, Ulrich averred that the Easton Reservoir was the closest reservoir to the property, that the water released therefrom went to the Mill River, which was located 150 feet below the elevation of the property, and that, consequently, water from the Easton Reservoir could not have reached the plaintiff's home on September 25, 2018. Moreover, Ulrich attested that there were no water main breaks in the area of the property on September 25, 2018, and that Aquarion had no responsibility for the town's storm drains or for any water runoff from other properties that would have crossed the plaintiff's property.

The plaintiff filed an objection to Aquarion's motion for summary judgment, to which she attached a number of exhibits, including her own sworn affidavit; excerpts from the transcript of Wheway's deposition; an incident report regarding flooding due to a dam breach in the town on September 25, 2018; a June 19, 2007 correspondence from Aquarion to the first selectman of Fairfield describing the terms of a water release plan under which Aquarion would make releases primarily from the Easton Reservoir; an Aquarion water diversion summary that lists dates between August 1 and October 10, 2018; and a map. The plaintiff argued that there were genuine issues of material fact that precluded granting summary judgment. Specifically, she argued that a factual question existed "as to whether Aquarion, through the release or diversion of water from the reservoirs it maintains or through other means, contributed to the flood on [her] property on September 25, 2018." The plaintiff recounted "evidence of a dam breach that day . . . and that Aquarion released water from its reservoirs" and, relying primarily on her own affidavit, argued that "there are a multitude of waterways at an equal or higher elevation that come through the easement on [her] property." She

maintained that "[a] map of the topography of [the town] can be misleading" and that she "believes, through her research, that the convergence of waters from various sources contributed to the flooding, and that Aquarion is responsible, in part, for the water that crossed her property" on September 25, 2018.[4]

The court, *Clark, J.*, heard oral argument on Aquarion's motion for summary judgment and, on December 21, 2023, issued a memorandum of decision granting the motion. The court concluded that "there is no dispute that the plaintiff cannot establish that Aquarion has [done] anything negligent, or that any Aquarion related conduct caused any of the plaintiff's damages on September 25, 2018." It described the "unprecedented rain event that took place on September 25, 2018," and determined that the summary judgment evidence "established that Aquarion's reservoirs are all located lower than the plaintiff's property and thus could not play a role in the damages claimed in this case." Moreover, the court noted that "[t]he plaintiff's expert testified that he has no reason to believe that Aquarion had anything to do with" the damage the property sustained. It deemed the plaintiff's opinion regarding the cause of the damage, as set forth in her affidavit, "[c]onclusory and self-serving," and determined that it did "not create a genuine issue of material fact in light of the corroborated evidence presented."

On January 9, 2024, the plaintiff filed a "motion for reargument/reconsideration" of the court's decision in which she argued that the court did "not reference any of the documentary evidence" she submitted. Although

---

[4] The plaintiff also argued that "discovery is incomplete," that additional depositions had been scheduled and that "[m]ore facts about the cause of the flooding on [her] property will be developed through those depositions." The plaintiff did not, however, before filing her objection, file a motion for extension of time pursuant to Practice Book § 17-47 that sought a "continuance to permit . . . discovery to be had," and she does not claim in this appeal that the court ruled prematurely on Aquarion's motion. See, e.g., *Joseph* v. *Commissioner of Correction*, 153 Conn. App. 570, 574, 102 A.3d 714 (2014) (deeming claims not briefed on appeal to be abandoned), cert. denied, 315 Conn. 911, 106 A.3d 304 (2015).

she acknowledged that "these documents do not provide direct evidence that Aquarion's release of water, or other actions, contributed to the flooding of [her] property," she argued that when "read in concert with [her] affidavit, [they] do create a genuine issue of material fact as to whether Aquarion may have contributed to the flooding condition."

On November 30, 2023, the town filed a motion for summary judgment as to counts one and two of the plaintiff's complaint and a memorandum of law in support thereof.[5] Attached to the motion were exhibits including excerpts from interrogatory responses by the plaintiff; a sworn affidavit by Edward Nagy, who was both the town engineer and public works director for the town; and excerpts from the transcript of the plaintiff's deposition. The town claimed that the negligence count set forth in count one was barred by governmental immunity because it was predicated on acts or omissions that required the exercise of judgment or discretion.[6] Relying, in part, on this court's decision in *Silberstein* v. *54 Hillcrest Park Associates, LLC,* 135 Conn. App. 262, 41 A.3d 1147 (2012), the town argued that the "maintenance of road drainage systems and catch basins, absent a specific policy, is a discretionary task" and that there was no

[5] The town's motion for summary judgment references the original complaint filed on July 19, 2017. The operative complaint as of November 30, 2023, however, was the May 1, 2023 third amended complaint. We discern no appreciable distinction between the iterations of the complaint insofar as the town and its motion for summary judgment are concerned; see footnote 2 of this opinion; and no party has claimed otherwise in this appeal. We also note that the town filed an answer and special defenses to the third amended complaint. As it had when it answered the revised complaint, the town raised statutory and governmental immunity as special defenses to counts one and two of the third amended complaint but did not raise a statute of limitations defense to count two.

[6] In advancing this argument, the town pointed out that the plaintiff had not cited in her complaint "any statute that abrogates the immunity afforded to the defendant at common law," and maintained that it was entitled to governmental immunity for this reason alone. Even so, the town also analyzed General Statutes § 52-557n, "the statute abrogating immunity," and argued that it was entitled to immunity thereunder, as well.

policy or directive that rendered its duty to maintain the drainage system in this case ministerial in nature. The town also claimed that the nuisance count set forth in count two failed as a matter of law because **(1)** the alleged nuisance, i.e., the flooding of the property, was not created by a positive act of the town and thus, it too was barred by governmental immunity, and **(2)** it was barred by the applicable statute of limitations.

The plaintiff filed an objection to the town's motion for summary judgment on January 12, 2024, arguing with respect to the negligence count that the town had "a *direct* (or nondiscretionary) duty" because it held easements on the property and that governmental immunity was therefore "immaterial" to the analysis. **(Emphasis in original.)** Alternatively, the plaintiff argued that there remained genuine issues of material fact as to whether the town was exercising ministerial or discretionary duties with respect to its maintenance, inspection and/or design of the drainage system. With regard to the nuisance count, the plaintiff pointed to evidence regarding the town's design and execution of improvements it made to the drainage system that were deemed inadequate, and the town's diversion of water into that inadequate system, and argued that a genuine issue of material fact existed as to whether the town created, or participated in the creation of, the alleged nuisance. She also argued that her nuisance claim was not "time-barred as the flooding nuisance, which can be abated by [the town's] repair or renovation of its drainage system that runs through its easement, continues to this day."[7] The town filed a

---

[7] The plaintiff attached several exhibits to her objection, including a copy of a warranty deed recorded in the Easton Land Records at volume 145, page 303, transferring the property from Arline M. Fritz to the plaintiff; sworn affidavits by Wheway and the plaintiff; excerpts from transcripts of depositions by Nagy and the town's expert, Thomas H. Fenton, P.E.; the Wheway report; a copy of an October 26, 1953 map depicting Ferndale Drive, Morningside Road and Marsh Road; a copy of an August 12, 1957 revised map depicting Ferndale Drive, Morningside Road and Marsh Road; a copy of June 16, 1975 correspondence from Griswold and Fuss, Inc., consulting engineers and surveyors, to the town's first selectman, regarding "Drainage—Morningside Drive

reply memorandum, and the plaintiff filed a surreply memorandum.[8]

The court, *Clark, J.*, heard oral argument on the town's motion for summary judgment on January 22, 2024, and, on May 9, 2024, issued a memorandum of decision in favor of the town as to counts one and two of the second amended complaint.[9] With respect to the negligence count, the court explained that, as a general rule, "the maintenance of storm drains is discretionary in nature" and concluded that, given the absence of a legal directive that prescribed the manner in which the town was to design, construct, inspect, maintain and repair its storm water drainage systems, "[a]ny actions or inactions by the town, such as those alleged in counts one and two of the amended complaint, are purely discretionary and

to Sturbridge Road"; a copy of January 5, 1981 correspondence from the town's first selectman to Larry Edwards, P.E., awarding Edwards a contract for construction of a drainage system between "Morningside Drive and Sturbridge Road"; a copy of a February 20, 1981 map "showing easement to be acquired by" town; a copy of an easement on the property granted to the town on May 11, 1981, by Brian P. Maher and Arline F. Maher; a copy of "Drainage Computations, Morningside to Sturbridge, dated [January 20, 1982]" prepared by Larry Edwards Associates; a copy of August 19, 1982 correspondence from the town's first selectman awarding Pace Construction, Inc., the bid for the "Morningside Drive to Ferndale Drive" storm drainage improvement project; a copy of March 8, 1983 correspondence from Nagy to Pace Construction Company, Inc. (Pace), detailing items Pace needed to correct following the drainage improvements it made at "Morningside [Road] and Ferndale Drive"; copies of photographs depicting flooding of the property, property damage, and drainage pipes; copies of several pieces of correspondence by and between the plaintiff and local government officials regarding the September 25, 2018 flooding; a copy of the town's subdivision regulations effective February 14, 1989; a copy of the town's subdivision regulations effective October 1, 2023; excerpts from the October, 2000 Department Of Transportation Drainage Manual; and case law.

[8] The plaintiff attached to her surreply memorandum two additional copies of a map that depicts, inter alia, portions of Marsh Road, Morningside Road and Ferndale Drive.

[9] As previously noted, the town referenced the original complaint in its motion, although the operative complaint at that time was the third amended complaint. See footnote 5 of this opinion. No party has raised an issue in this appeal as to these discrepancies, which in this case are technical in nature. See *Metropolitan District* v. *Mott*, 235 Conn. App. 449, 463, 346 A.3d 1064 (2025).

entitled to governmental immunity."[10] In doing so, the court expressly rejected the plaintiff's argument that the existence of the storm drainage easement that referenced the town's "right, privilege and authority to maintain a storm drainage pipe, including the right to lay, maintain, operate, construct, alter, repair and replace the same and its appurtenances, including appropriate headwalls and manholes in, over or through [the] property" called for a different conclusion. The court determined that "[t]he maintenance responsibility under the easements[11] . . . is aligned with the general nature of discretionary maintenance for [the town] with respect to all drainpipes." (Footnote added.)

With respect to the nuisance count, the court acknowledged that "[a] municipality may be liable for a nuisance that it creates and maintains" but concluded that, in this case, the plaintiff "failed, as a matter of law, to show that there was a positive act by [the town] that caused the flooding." In reaching this conclusion, however, the court recited and relied on various allegations by the plaintiff, which included alleged "affirmative acts," and described them as sounding in "negligent malfeasance, whether in the construction or maintenance of the pipes in the easement area and surrounding storm drains." As such, the court determined that "[t]he alleged conduct or inaction/nonfeasance of the [town] as alleged is all within its protected discretionary authority," that the town was "entitled to assert governmental immunity to the nuisance count," and it granted summary judgment in the town's favor as to count two for this reason. (Emphasis added.)

---

[10] The court had noted, at the outset, that, because both parties focused on General Statutes § 52-557n in their arguments, it would assume that the plaintiff had cited that statute in her complaint, and it assessed her claim as if she had. No party has challenged the propriety of the court having done so in this appeal.

[11] The record reflects that the first easement was granted to the town "over the lot that would eventually be Plaintiff's property" in or about August, 1957. The record does not indicate what language, if any, is associated with that easement.

The court also addressed the town's claim that the plaintiff's nuisance count was barred by either the two year statute of limitations set forth in General Statutes § 52-584 or the three year statute of limitations set forth in § 52-577. In doing so, the court stated that "[t]he only positive act that has been alleged by the plaintiff is that the town diverted the water into storm water drainage systems and related easements. The alleged actions creating the easements took place in the 1980s (per the complaint), and therefore, took place more than three years before the plaintiff brought her nuisance claims. Accordingly, the nuisance claims are time barred under . . . § 52-577," and the court granted summary judgment in the town's favor as to count two for this reason, as well.[12]

Also on May 9, 2024, the court, *Clark, J.,* issued an order denying the plaintiff's "motion to reargue/reconsider" the granting of summary judgment in favor of Aquarion. The plaintiff then filed the present appeal, challenging the summary judgments in favor of the defendants and the denial of her motion for reargument/ reconsideration.[13] Additional facts and procedural history will be set forth as necessary.

Before we address the plaintiff's specific claims, we set forth our standards of review. "Our standard of review with respect to a court's ruling on a motion for summary judgment is well settled. Practice Book § [17-49] provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material

---

[12] The court did not address the town's alternative argument that the plaintiff's nuisance count was barred by § 52-584 and, with respect to what it deemed the plaintiff's "claim under the continuing course of conduct doctrine" that would have tolled the statute of limitations, the court determined that because she had not pleaded the doctrine "in either her complaint or reply to special defenses, [she] cannot argue said doctrine at this time."

[13] Thereafter, on May 30, 2024, the plaintiff filed a motion for articulation with respect to the denial of her "motion to reargue/reconsider" the summary judgment rendered in favor of Aquarion, which the court denied. The plaintiff then filed with this court a motion for review of that denial. This court granted review but denied the relief requested.

fact and that the moving party is entitled to judgment as a matter of law. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact. . . . [I]ssue-finding, rather than issue-determination, is the key to the procedure. . . . [T]he trial court does not sit as the trier of fact when ruling on a motion for summary judgment. . . . [Its] function is not to decide issues of material fact, but rather to determine whether any such issues exist. . . . Our review of the decision to grant a motion for summary judgment is plenary. . . . We therefore must decide whether the court's conclusions were legally and logically correct and find support in the record." (Internal quotation marks omitted.) *Adams* v. *Aircraft Spruce & Specialty Co.,* 215 Conn. App. 428, 440–41, 283 A.3d 42, cert. denied, 345 Conn. 970, 286 A.3d 448 (2022).

"[T]ypically [d]emonstrating a genuine issue requires a showing of evidentiary facts or substantial evidence outside the pleadings from which material facts alleged in the pleadings can be warrantably inferred. . . . Moreover, [t]o establish the existence of a material fact, it is not enough for the party opposing summary judgment merely to assert the existence of a disputed issue. . . . Such assertions are insufficient regardless of whether they are contained in a complaint or a brief. . . . Further, unadmitted allegations in the pleadings do not constitute proof of the existence of a genuine issue as to any material fact. . . . Mere statements of legal conclusions . . . and bald assertions, without more, are insufficient to raise a genuine issue of material fact capable of defeating summary judgment. . . .

"[I]t [is] incumbent upon the party opposing summary judgment to establish a factual predicate from which it can be determined, as a matter of law, that a genuine issue of material fact exists. . . . [M]aterial facts are those that will make a difference in the case, and they must be pleaded." (Citation omitted; internal quotation marks omitted.) *Begley* v. *State*, 234 Conn. App. 820, 827–28, 344 A.3d 982 (2025), cert. granted, 354 Conn. 902, A.3d (2026).

Our standard of review with respect to the court's ruling on the plaintiff's motion for reargument/reconsideration is abuse of discretion. *Kuselias* v. *Zingaro & Cretella, LLC*, 224 Conn. App. 192, 222, 312 A.3d 118, cert. denied, 349 Conn. 916, 316 A.3d 357 (2024). "As with any discretionary action of the trial court . . . the ultimate [question for appellate review] is whether the trial court could have reasonably concluded as it did." (Internal quotation marks omitted.) Id.

I

The plaintiff first claims that the court improperly rendered summary judgment in favor of the town on the basis of its determination that her claims for negligence, as alleged in count one of her complaint, and for nuisance, as alleged in count two of her complaint, both were barred by the doctrine of governmental immunity. We disagree with the plaintiff insofar as her negligence claim is concerned, and we affirm the court's judgment as to count one of her complaint. We agree with the plaintiff insofar as her nuisance claim is concerned, and we reverse the court's judgment as to count two of her complaint.

At the outset, we set forth the well settled law of this state regarding the liability of municipalities. "According to our Supreme Court, [a] municipality itself was generally immune from liability for its tortious acts at common law . . . . [The court has] also recognized, however, that governmental immunity may be abrogated by statute." *DiMiceli* v. *Cheshire*, 162 Conn. App. 216, 223, 131 A.3d 771 (2016). General Statutes § 52-557n (a) (1)

provides in relevant part: "Except as otherwise provided by law, a political subdivision of the state shall be liable for damages to person or property caused by: (A) The negligent acts or omissions of such political subdivision or any employee, officer or agent thereof acting within the scope of his employment or official duties . . . and (C) acts of the political subdivision which constitute the creation or participation in the creation of a nuisance . . . ." "[Our Supreme Court] previously [has] concluded that [t]his language clearly and expressly abrogates the traditional common-law doctrine in this state that municipalities are immune from suit for torts committed by their employees and agents. . . .[14]" (Footnote in original; internal quotation marks omitted.) *DiMiceli* v. *Cheshire*, supra, 223; see also *Doe* v. *Petersen,* 279 Conn. 607, 614, 903 A.2d 191 (2006) (§ 52-557n "abandons the common-law principle of municipal sovereign immunity and establishes the circumstances in which a municipality may be liable for damages").

We now address, in turn, the plaintiff's claims that the court improperly rendered summary judgment in favor of the town with respect to her negligence and nuisance causes of action.

A

In count one of her complaint, which sounds in negligence against the town, the plaintiff alleged that the town had been granted two storm drain easements on the property that it used to "divert, channel and/or drain water through the property by way of a forty-eight inch wide diameter pipe" it "owned, controlled and/or maintained . . . ." This pipe ran from the corner of Morningside Road to Ferndale Drive. The plaintiff further alleged that the town "had the duty to maintain the easements,

[14] "Our Supreme Court has cautioned that '[s]tatutes that abrogate or modify governmental immunity are to be strictly construed' because if 'a statute is in derogation of common law or creates a liability where formerly none existed, it should receive a strict construction and is not to be extended, modified, repealed or enlarged in its scope by the mechanics of construction.' . . . *Rawling* v. *New Haven*, 206 Conn. 100, 105, 537 A.2d 439 (1988)." *DiMiceli* v. *Cheshire,* supra, 162 Conn. App. 223 n.5.

by way of the easements pipe, in such a manner as to prevent the overflow, deterioration and destruction of the easements passageways, by way of the easements pipe, and, in turn, prevent flooding of . . . [the] property," and that it failed to do so. The town's "duties" in this regard were alleged to be "ministerial in nature." Although the plaintiff included language from one easement in her allegations, she did not expressly allege any possible sources for the town's ministerial duties.[15]

"Subdivision (2) of §52-557n (a) . . . contains two significant limitations to the statutory abrogation of governmental immunity. [One exception] provides as follows: Except as otherwise provided by law, a political subdivision of the state shall not be liable for damages to person or property caused by . . . (B) negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law. General Statutes §52-557n (a) (2) (B). The statutory scheme of §52-557n, accordingly, distinguishes between discretionary and ministerial acts, with liability generally attaching to a municipality only for negligently performed ministerial acts, not for negligently performed discretionary acts.[16]" (Footnote in original; internal quotation marks

[15] Specifically, she alleged that the easement "provides [the town] with the right to 'maintain a storm drainage pipe, including the right to lay, maintain, operate, construct, alter, repair and replace the same and its appurtenances . . . over or through property of the Grantors. . . .'"

[16] "'Even if a municipal defendant's conduct is discretionary in nature, our courts have identified three exceptions to discretionary act immunity. Each of these exceptions represents a situation in which the public official's duty to act is [so] clear and unequivocal that the policy rationale underlying discretionary act immunity—to encourage municipal officers to exercise judgment—has no force. . . . First, liability may be imposed for a discretionary act when the alleged conduct involves malice, wantonness or intent to injure. . . . Second, liability may be imposed for a discretionary act when a statute provides for a cause of action against a municipality or municipal official for failure to enforce certain laws. . . . Third, liability may be imposed when the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm.' . . . *Northrup* v. *Witkowski*, 175 Conn. App. 223, 234, 167 A.3d 443 (2017), aff'd, 332 Conn. 158, 210 A.3d 29 (2019)." *Ready* v. *New Canaan*, 232 Conn. App. 487, 494

omitted.) *Ready* v. *New Canaan*, 232 Conn. App. 487, 493–94, 336 A.3d 1252 (2025).

"The hallmark of a discretionary act is that it requires the exercise of judgment. . . . In contrast, [m]inisterial refers to a duty which is to be performed in a prescribed manner without the exercise of judgment or discretion. . . . In order to create a ministerial duty, there must be a city charter provision, ordinance, regulation, rule, policy, or any other directive [compelling a municipal employee] to [act] in any prescribed manner. . . .

"In general, the exercise of duties involving inspection, maintenance and repair of hazards are considered discretionary acts entitled to governmental immunity. . . . A municipality necessarily makes discretionary policy decisions with respect to the timing, frequency, method and extent of inspections, maintenance and repairs. . . . Although the determination of whether official acts or omissions are ministerial or discretionary is normally a question of fact for the fact finder . . . there are cases where it is apparent from the complaint. . . . [W]hether an act or omission is discretionary in nature and, thus, whether governmental immunity may be successfully invoked pursuant to § 52-557n (a) (2) (B), turns on the character of the act or omission complained of in the complaint. . . . Accordingly, where it is apparent from the complaint that the defendants' allegedly negligent acts or omissions *necessarily* involved the exercise of judgment, and thus, necessarily were discretionary in nature, summary judgment is proper." (Citations omitted; emphasis in original; internal quotation marks omitted.) *DiMiceli* v. *Cheshire*, supra, 162 Conn. App. 224–25.

In *Silberstein* v. *54 Hillcrest Park Associates*, *LLC*, supra, 135 Conn. App. 273, this court concluded that a

n.1, 336 A.3d 1252 (2025). The plaintiff does not argue, however, that any of these exceptions apply to her negligence claim against the town and, thus, we need not address them. See, e.*g.*, *Joseph* v. *Commissioner of Correction*, 153 Conn. App. 570, 574, 102 A.3d 714 (2014) (deeming claims not briefed on appeal to be abandoned), cert. denied, 315 Conn. 911, 106 A.3d 304 (2015).

municipality's duty to maintain storm drains was discretionary in nature. The plaintiffs in *Silberstein* were the owners of a property located in the Hillcrest Park neighborhood of Old Greenwich. Id., 264. They brought an action against the defendants, a tax association and a private tax district for the Hillcrest Park neighborhood, alleging, inter alia, that the defendants were negligent in failing to properly maintain the roads and drainage systems in the neighborhood, resulting in the periodic flooding of the plaintiffs' property. Id., 265. The defendants moved for summary judgment on grounds that the plaintiffs' negligence claim was barred by governmental immunity, and the trial court rendered summary judgment in favor of the defendants. Id., 266–67. In affirming the judgment of the trial court, this court explained that, although the tax district's bylaws clearly stated that one of its purposes was "to construct and maintain roads . . . drains, [and] storm sewers," the bylaws did not "prescribe the manner in which the roads and drainage systems are to be maintained, and there is no evidence in the record of any procedure or directive governing the manner of their maintenance. Given this lack of directive, the manner in which the defendants discharge their duty to maintain the roads and drainage systems plainly involves the exercise of judgment and discretion." (Emphasis in original; internal quotation marks omitted.) Id., 273.

Thereafter, in *Northrup* v. *Witkowski*, 332 Conn. 158, 161, 185, 210 A.3d 29 (2019), the plaintiff property owners brought an action against the borough of Naugatuck and several town officials to recover for flooding damage to their property that allegedly occurred "because the single catch basins in the area routinely became clogged or inadequately redirected water away from the property." Our Supreme Court discussed this court's decision in *Silberstein* and explained that, in order to determine whether a municipality's duty with respect to its storm drains and sewers is ministerial or discretionary, "the relevant consideration under well established modern principles of governmental immunity remains whether

the duty was a general one or, instead, whether there was a city charter provision, ordinance, regulation, rule, policy or any other directive [requiring the government official to act in a] prescribed manner." (Internal quotation marks omitted.) Id., 185. The court thus concluded that a municipal defendant charged with negligently maintaining storm drains and sewers "may be held liable to the plaintiffs only if there was some legal directive prescribing the specific manner in which they were required to maintain and repair the town's storm sewer system." Id. In *Northrup*, as in *Silberstein*, because there was no such directive, the court held that the municipal "defendants' duty to maintain and repair the town's storm drains and sewers was discretionary," and it upheld this court's determination that the trial court had properly granted the defendant's motion for summary judgment on the ground of governmental immunity. Id., 190. In reaching this conclusion, the court also made clear "that neither the creation of a schedule for cleaning all catch basins at least once per year, nor the practice of attempting to respond to every complaint about malfunctioning storm drains, constitutes a 'policy or rule' converting the discretionary duty to carry out the functions mandated by [ordinance] into a clear ministerial duty." Id., 188.

In the present case, Nagy averred in his affidavit that "[t]here is no charter provision, ordinance, regulation, rule, policy, or any other directive that prescribes the manner in which the [town] designs, constructs, inspects, maintains and repairs storm water drainage systems in the [t]own." Rather, such actions are "left up to the judgment and discretion of [t]own employees and performed on a case-by-case basis." The plaintiff, in turn, neither alleged, nor provided evidence of, any directive that prescribes the manner in which the town's "duty to maintain the easements by way of the easements pipe . . . [to] prevent flooding of" her property was to be performed. See *Adams* v. *Aircraft Spruce & Specialty Co.*, supra, 215 Conn. App. 441. Thus, in accordance with the "well established modern principles of governmental immunity" that apply in Connecticut, and the reasoning

of *Silberstein* and *Northrup* in particular, the town's duty to do so was discretionary. See *Northrup* v. *Witkowski*, supra, 332 Conn. 185.

The plaintiff argues, however, that reliance "upon the likes of *Silberstein* . . . and *Northrup* . . . to enunciate the . . . law" that applies in this case is misplaced because "no easements were involved in *Northrup* or *Silberstein*." She maintains that the town's status as an easement holder over her property renders its duty to maintain the easement and the drainage system included within the easement "inherent (or heightened)" and argues that the "discretionary-ministerial" duty distinction is not implicated. Alternatively, although along similar lines, she posits that the town's duty is ministerial in nature because of "its inherent responsibilities and duties as easement holder." Finally, although she does not argue that the language of the easement constitutes an express directive that compels a municipal employee to act in a prescribed manner with respect to maintaining the easements and the drainage system, she maintains that, if the "discretionary-ministerial" duty distinction applies in this case, there is a genuine issue of material fact as to whether there are "legal directives that prescribe the way [the town] should design, inspect and maintain the drainage system."

The town argues, in response, that the plaintiff's negligence claim is predicated on the alleged breach of duties that fall squarely within the ambit of the doctrine of governmental immunity. The town maintains that the fact that it is an easement holder does not alter this conclusion and that "all of the alleged negligen[t] acts in this case are discretionary acts for which the [town] has governmental immunity." We agree with the town.

Stated simply, the plaintiff offers no support for the novel proposition that because the town is an easement holder, the principles of governmental immunity set forth in *Silberstein* and *Northrup* should not be applied in this case. Although she relies primarily on our Supreme Court's decision in *Center Drive-In Theatre, Inc.* v. *Derby*, 166 Conn. 460, 352 A.2d 304 (1974), to support her

argument, *Center Drive-In Theatre, Inc.*, did not involve a claim of governmental immunity. Id.

In *Center Drive-In Theatre, Inc.*, the plaintiff property owner granted the city of Derby (city) an easement for the construction of sewer pipelines. Id., 462. While installing the pipelines, the city's contractor breached a dike on the plaintiff's property that had been providing it with flood control protection. Id., 461–62. Because the easement, which was set forth in a written agreement, included no provision for the restoration of the dike, the city did not repair the dike, and it instructed its contractor not to do so. Id., 462. The plaintiff had the dike repaired by an independent contractor and then brought an action against the city and its contractor to recover for the cost it incurred for doing so. Id., 462. The plaintiff prevailed in a trial against both defendants, and the defendants appealed. Id., 461.

Our Supreme Court, in affirming the judgment rendered against the city,[17] enunciated the general rule that "[w]here the instrument is silent, the owner of an easement has a duty to make such repairs as are necessary for the owner of the land to have the reasonable use of his estate." Id., 464; see also *Beneduci* v. *Valadares*, 73 Conn. App. 795, 807, 812 A.2d 41 (2002). Moreover, it stated that "[t]he owner of an easement may be held liable for damages caused by his negligent use of the easement, and this liability extends to damages to the servient estate." *Center Drive-In Theatre, Inc.* v. *Derby*, supra, 166 Conn. 464. And, because "part of the use to which the . . . city . . . subjected the plaintiff's land was the removal of a portion of the flood control dike," which allowed "the land to remain exposed to a greater risk of harm from flooding," the court determined that the city was responsible for the cost of the repairs to the dike even though the easement it had been granted did not expressly say so. Id., 465–66. As we previously have

---

[17] The court set aside the judgment against the contractor because "no basis [had] been shown for recovery from the defendant contractor." *Center Drive-In Theatre, Inc.* v. *Derby*, supra, 166 Conn. 468.

noted, however, governmental immunity was not at issue in *Center Drive-In Theatre, Inc.*, and, thus, the nature of the city's duty to repair the dike did not factor into the court's analysis. Because governmental immunity is the issue in the present case, and it is the nature of the town's duty to maintain the storm drainage system that is the relevant consideration; see *Northrup* v. *Witkowski*, supra, 332 Conn. 185; *Center Drive-In Theatre, Inc.*, is inapposite, and the plaintiff's reliance thereon is misplaced.

Even so, the storm drain easements the town held on the property do inform our analysis. Specifically, the easement that expressly references the town's "right, privilege and authority to maintain a storm drainage pipe, including the right to lay, maintain, operate, construct, alter, repair and replace the same and its appurtenances, including appropriate headwalls and manholes in, over or through" the property is germane. That easement, similar to the bylaws in *Silberstein*, does not prescribe the manner in which the town's "duty to maintain" the easements is to be carried out. See *Silberstein* v. *54 Hillcrest Park Associates, LLC,* supra, 135 Conn. App. 273. As such, we agree with the trial court's conclusion that "[t]he maintenance responsibility under the easements is no different and is aligned with the general nature of discretionary maintenance for [the town] with respect to all storm drainpipes." Although the plaintiff argues that there is a genuine issue of material fact as to whether there are "legal directives that prescribe the way [the town] should design, inspect and maintain the drainage system" that should negate this conclusion, there simply is no evidence in the record of any procedure or directive from which such a material fact can properly be inferred. See *Begley* v. *State*, supra, 234 Conn. App. 827–28. To the extent that the plaintiff argues that "it can be inferred from the language [of the easement] that the town . . . had such a duty," we reiterate that it is the nature of the duty that is at issue, not the existence thereof; see *Northrup* v. *Witkowski*, supra, 332 Conn. 185; and, in the absence of an express directive that says otherwise, the nature of the town's

duty to maintain the storm drainage system within the easements in this case is discretionary. See *Silberstein* v. *54 Hillcrest Park Associates, LLC*, supra, 135 Conn. App. 273. Moreover, the plaintiff's argument that the town's practice of sending crews out to clear catch basins in advance of rainstorms evinces a "routine, or 'prescribed manner'" that transformed the town's duty to maintain the storm drainage system into a ministerial duty cannot be reconciled with our Supreme Court's conclusion in *Northrup.* See *Northrup* v. *Witkowski,* supra, 188. Finally, although the plaintiff asserts that "it is *arguable* that the town's subdivision regulations provide directives as to the design, construction and inspection of storm drainage systems" in general, there is no language within those regulations that ties those regulations to the property or prescribes the manner in which the maintenance of the systems to which they apply shall be performed. (Emphasis added.) As such, the plaintiff has done nothing more than assert the existence of a disputed issue in this regard, which is insufficient. See *Begley* v. *State*, supra, 827–28.

For the foregoing reasons, we conclude that the manner in which the town was to discharge its "duty to maintain the easements, by way of the easements pipe . . . [to] prevent flooding of" the property involved the exercise of judgment and discretion and was discretionary in nature. We further conclude, therefore, that the discretionary act exception to the statutory abrogation of governmental immunity applies to the plaintiff's negligence claim against the town and that the court properly determined that the town was entitled to summary judgment as to count one of the complaint as a matter of law.

B

In count two of her complaint the plaintiff alleged that the town affirmatively created a nuisance that caused the flooding and the damages the property sustained as a result thereof. "[Our Supreme Court] has stated often that a plaintiff must prove four elements to succeed in a nuisance cause of action: (1) the condition complained

of had a natural tendency to create danger and inflict injury [on] person or property; **(2)** the danger created was a continuing one; **(3)** the use of the land was unreasonable or unlawful; [and] **(4)** the existence of the nuisance was the proximate cause of the plaintiffs' injuries and damages. . . . In addition, when the alleged tortfeasor is a municipality, our common law requires that the plaintiff also prove that the defendants, by some positive act, created the condition constituting the nuisance. (Citation omitted; internal quotation marks omitted.) *Picco* v. *Voluntown*, 295 Conn. 141, 146, 989 A.2d 593 (2010).

In this case, the plaintiff expressly alleged that "[t]he diversion of the tremendous volume of water into . . . the easements, by way of the easements pipe, on the property, which was not properly inspected or maintained, as well as [the town's] failure to properly design and maintain the catch basins at the corner of Morningside Road and Marsh Road, was an affirmative act of [the town]" that constituted an invasion of her interest in, and unreasonably interfered with, her private use and enjoyment of her property. Although the town raised governmental immunity as a special defense to this claim, it did not raise a statute of limitations special defense. The plaintiff claims on appeal that the court improperly granted the town's motion for summary judgment as to her nuisance claim because she demonstrated that a genuine issue of material fact existed as to whether the town, by some positive act, created the condition(s) constituting the nuisance. She also claims that the court improperly granted summary judgment in the town's favor as to her nuisance claim on the alternative ground that it was time barred by the statute of limitations set forth in § 52-577. We agree with both of the plaintiff's claims.

1

We begin our analysis of the plaintiff's claim that there are genuine issues of material fact that should have precluded summary judgment as to her nuisance cause of action by recounting the following procedural history. To support its claim that the plaintiff's "nuisance

claim fails . . . as the alleged nuisance was not created by some positive act of the municipality," the town argued that the "plaintiff has failed to allege that a positive act by the [town] caused the flooding. Instead, she alleges negligent nonfeasance." It characterized the plaintiff's allegations as "claiming that there was a failure to take remedial steps," posited that it could not be held liable for nuisance under such circumstances and, focusing solely on those allegations, argued that "the plaintiff cannot, as a matter of law, show that there was a positive act by the municipal defendant that caused the flooding." [18]

In response, the plaintiff filed an objection in which she disputed the town's characterization of her allegations and argued, inter alia, that there exists a genuine issue of material fact as to whether the town created or participated in creating a nuisance. In support of her objection, the plaintiff submitted evidence that detailed the evolution of and development within the watershed area where the property sits. Included in the Wheway report are several maps and aerial photographs that illustrate changes made, over time, to the watershed area. These changes included the development of roads and subdivisions and alterations to the watershed area. Wheway explained in his report that this "development within the watershed area modified drainage areas and discharge points." He opined therein that "[m]anmade interactions and developments within the current watershed area, reviewed and approved by the [town], [led] to the flooding of the . . . property on September 25, 2018," because these approvals for "various subdivisions and roadway construction within the watershed area failed to adequately account for runoff, allowing it to be diverted to the intersection of Marsh and Morningside Roads."

[18] The town attached to the memorandum of law it filed in support of its motion for summary judgment certain responses the plaintiff gave to interrogatories it had served on her. It recounted in its memorandum that the plaintiff responded to interrogatory number 46, which read "[i]n addition to the allegations in the complaint, state with particularity all facts upon which you base the contention in your complaint that the town . . . created a nuisance on the property," by stating "[o]bjection, the interrogatory calls for legal conclusions; the complaint speaks for itself."

This inadequately accounted for diversion, Wheway explained, "resulted in an undersized [t]own . . . drainage system. The catch basins and pipes at the intersection of Marsh and Morningside Roads are incapable of conveying the design flows to the downstream storm sewers. This resulted in overland flow conditions onto the [plaintiff's] property."

Wheway also noted in his report that Griswold & Fuss Consulting Engineers and Surveyors had made recommendations to improve the design of the system in a June 16, 1975 report (1975 report) to the town and that certain of these recommendations were not implemented when the town had subsequent upgrades to the drainage system made. The 1975 report, which the plaintiff submitted as a separate exhibit in support of her objection to the town's motion for summary judgment, specified that the recommendations were intended "to alleviate the flooding problems in [the Morningside Drive] area" that existed at that time. Among other things, the 1975 report recommended that an additional pipe running to Ferndale Road be added to the existing pipe, that "a double grate catch basin [be constructed] at the intersection of Morningside Drive and Marsh Road to give ample grate capacity at this low point and [to] lay an 18-inch pipe to the junction box east of Morningside Drive." Wheway specifically averred in his report, however, that, "[w]hile upgrades to the pipe system through the [t]own . . . easement were made in the 1980's, the [t]own . . . knew from the [1975 report] that in addition to the undersized pipe running through the easement, that there was insufficient grate capacity at the intersection of Marsh and Morningside Roads. The lack of proper analysis and design for the catch basins and pipes at the intersection of Marsh and Morningside Roads which are connected to the easement piping, facilitated the bypass overflow from the intersection and the subsequent loss of property to [the plaintiff]." He further opined that, "[h]ad the . . . drainage upgrade . . . been properly designed, analyzed and implemented along with provisions for overflow and by-pass containment within the [town's] . . . easement,

the flood waters from the [September 25, 2018] storm would not have had the devastating impact on the . . . property." Indeed, in suggesting ways to remediate the present day flooding problems, Wheway averred in his affidavit that "[t]he construction of a double grate catch basin at the intersection of Marsh and Morningside Roads referenced in [the 1975 report] would substantially reduce the amount of overland flow and flooding directed to the . . . property."

In its reply to the plaintiff's objection, with respect to the substance of the nuisance claim, the town argued that the "only [issue] to be decided [is] . . . whether the plaintiff has 'evidence' that the town engaged in some positive act that created the alleged nuisance." To this end, the town posited that "[f]or the plaintiff to overcome summary judgment, she must come forward with *admissible evidence*, not allegations, showing that the defendant is not entitled to summary judgment. She cannot do so in this case.

"There is no 'evidence' of a positive act that created the alleged nuisance. To be clear, it is not any positive act. Instead, the plaintiff must come forward with 'evidence' that the town engaged in some positive act that *created the nuisance*. In this case, the nuisance is water flowing over the plaintiff's property. There is no evidence in the record that the town created that condition. Instead, the plaintiff is claiming that the town was engaged in malfeasance in its design, construction, maintenance and repairs of its drainage system, which led to the alleged flood."[19] (Emphasis in original.)

Although the trial court acknowledged in its memorandum of decision that "[a] municipality may be liable for a nuisance that it creates and maintains," it did not reference the evidence the plaintiff presented, let alone analyze that evidence to determine whether it created a question of material fact in this regard. Instead, it twice stated that a municipality is "not liable where

---

[19] We note that the town includes this exact same language in its brief to this court.

its sole fault is a failure to take remedial steps," and, focusing solely on the plaintiff's allegations, explained that "[t]he plaintiff alleges negligent nonfeasance or failure to perform maintenance, inspection, and repair acts in such a way so as to cause a nuisance." The court determined, for this reason, that the plaintiff "failed, as a matter of law, to show that there was a positive act by [the town] that caused the flooding," held that "[t]he alleged conduct or inaction/nonfeasance of the [town] as alleged is all within its protected discretionary authority and thus reasonable" and that the town was "entitled to assert governmental immunity to the nuisance count," and it granted summary judgment in the town's favor as to count two.

At the outset, we note that the court's determination that "[t]he alleged conduct or inaction/nonfeasance of the [town] as alleged is all within [the town's] protected discretionary authority and thus reasonable" and that the town "is entitled to assert governmental immunity to the nuisance count" as a result, reflects a misapplication of the law. Our Supreme Court has held that "a municipality may be liable for a nuisance . . . even if [its] misfeasance or nonfeasance also constitutes negligence from which the municipality would be immune because the municipality was engaged in a discretionary function." (Internal quotation marks omitted.) *Northrup* v. *Witkowski*, supra, 332 Conn. 182. In other words, if the town, by positive act, either created or participated in the creation of a nuisance that caused damage to the plaintiff, it will be liable regardless of whether the positive act is discretionary or ministerial in nature. See, e.g., id., 183 (explaining that "our more recent cases have treated nuisance and the violation of a ministerial duty as entirely distinct theories of municipal liability").

Moreover, we disagree with the court's interpretation of the plaintiff's nuisance cause of action. "The interpretation of pleadings is always a question of law for the court. . . . Our review of the trial court's interpretation of the pleadings therefore is plenary. . . . Furthermore,

we long have eschewed the notion that pleadings should be read in a hypertechnical manner. *Rather,* **[***t***]***he modern trend, which is followed in Connecticut, is to construe pleadings broadly and realistically, rather than narrowly and technically. . . .* **[T]he complaint must be read in its entirety in such a way as to give effect to the pleading with reference to the general theory [on] which it proceeded, and do substantial justice between the parties. . . . Our reading of pleadings in a manner that advances substantial justice means that a pleading must be construed reasonably, to contain all that it fairly means, but carries with it the related proposition that it must not be contorted in such a way so as to strain the bounds of rational comprehension." (Emphasis in original; internal quotation marks omitted.)** *Stewart* v. *Old Republic National Title Ins. Co.,* **218 Conn. App. 226, 242, 291 A.3d 1051 (2023). We must also construe the allegations of the complaint in a manner most favorable to the plaintiff. See** *Rubin* v. *Brodie,* **228 Conn. App. 617, 654, 325 A.3d 1096 (2024).**

In her complaint, the plaintiff collectively identified "[t]he diversion of the tremendous volume of water into the easements" and the "failure to properly design . . . the catch basins at the corner of Morningside Road and Marsh Road" as "an affirmative act" by the town. The fact that she also referenced the town's alleged nonfeasance in failing to properly inspect or maintain portions of the storm drainage system cannot reasonably be read to negate her express allegation in this regard. See, e.*g.,* *Dreier* v. *Upjohn Co.,* 196 Conn. 242, 245, 492 A.2d 164 (1985) ("[u]nder our pleading practice, a plaintiff is permitted to advance alternative and even inconsistent theories of liability against one or more defendants in a single complaint").

In other words, the plaintiff did not, as the town argued and the trial court determined, predicate her nuisance claim solely on allegations that the town failed to take remedial steps to combat the nuisance after its creation. Rather, our plenary review of count two of the complaint

reveals that the plaintiff properly alleged that the town, by some positive act, created the alleged nuisance. *Stewart* v. *Old Republic National Title Ins. Co.*, supra, 218 Conn. App. 242; see also *Picco* v. *Voluntown*, supra, 295 Conn. 146. Moreover, in responding to the town's motion for summary judgment, the plaintiff came forward with evidence to support this allegation, but the court did not consider it, let alone view it in the light most favorable to her. See *Adams* v. *Aircraft Spruce & Specialty Co.,* supra, 215 Conn. App. 441. Our review of this evidence reveals that it suffices to raise a genuine issue of material fact regarding whether the town's "conduct in directing the water onto [the] property, by virtue of its easement rights . . . by way of a faulty, poorly designed and maintained drainage system" were positive acts that created, or participated in creating, a nuisance.

"A positive act is conduct that intentionally created the conditions alleged to constitute a nuisance. . . . [F]ailure to remedy a dangerous condition not of the municipality's own making is not the equivalent of the required positive act. . . . Similarly, permissive continuation of the alleged nuisance is not a positive act." (Internal quotation marks omitted.) *Rodriguez* v. *Hartford*, 224 Conn. App. 314, 331, 312 A.3d 85, cert. denied, 349 Conn. 907, 313 A.3d 512 (2024), and cert. denied, 349 Conn. 907, 313 A.3d 512 (2024). Even so, our Supreme Court has held that, "[i]f the town, by positive act, *either created or participated in the creation of a nuisance* resulting in damage to the plaintiffs, it is liable." (Emphasis added.) *Brennan* v. *West Haven*, 151 Conn. 689, 693, 202 A.2d 134 (1964).

In *Brennan,* the plaintiffs brought a nuisance claim against a town in connection with damage to their property caused by inadequate drain pipes the developer of an adjoining property had installed and over which the town had constructed a road. Id., 690–91. There was conflicting evidence presented at trial regarding the town's participation in the planning and construction related to the pipes and the road. Id., 690–92. The plaintiffs

claimed that the town had furnished and paid for the pipes and that the town engineer and other employees aided and assisted in planning, laying out and supervising the work. Id. Our Supreme Court held that the trial court properly refused the town's request to charge the jury that it could not be held liable unless the jury found "that the men who actually laid the pipe and did the construction work were acting as agents of the town within the scope of their authority"; id., **693;** because the request did not account for the possibility that the town might be liable if it otherwise participated in the creation of the condition claimed to be a nuisance. Id., **693–94.** The court explained that, "[i]f the town assisted or participated in the laying of the drainage pipes and if these pipes constituted a nuisance, the town could be held responsible for the damage resulting to the plaintiff's property." Id., **694.**

Similarly, in the present case, the plaintiff produced evidence that, over time, the town reviewed and approved changes to the watershed area in which the property is located, which, in turn, increased the runoff to more than its existing storm drainage system could handle during storms, that the town approved and implemented, or had implemented, purported upgrades or improvements to the storm drainage system that were inadequate and failed to alleviate the runoff problems they were intended to address and that the town diverted water, or allowed water to be diverted into the inadequate storm drainage system it created and/or participated in creating. This evidence plainly raises questions of material fact as to whether and to what extent the town participated in or created the condition giving rise to the alleged nuisance, namely, the "water flowing over the plaintiff's property." As such, factual issues exist concerning the town's creation of a nuisance that preclude summary judgment.

We therefore conclude, on the basis of the materials presented to the trial court, that there is a genuine issue of material fact regarding whether the town, by positive act, either created or participated in creating a nuisance

resulting in damage to the plaintiff. Accordingly, the trial court improperly granted the town's motion for summary judgment as to count two of her complaint on grounds that it was barred by governmental immunity.

2

The plaintiff also claims in her appellate brief that the court erroneously determined that her nuisance claim was time barred by the statute of limitations set forth in § 52-577. In support of that claim, she argues, inter alia, that the town waived its statute of limitations defense by failing to raise it as a special defense to her nuisance claim. See, e.g., *Commissioner of Mental Health & Addiction Services* v. *Saeedi*, 143 Conn. App. 839, 854, 71 A.3d 619 (2013) ("[w]here a particular statute of limitations . . . is not jurisdictional and has not been pleaded, [the opposing party] is entitled to conclude that it was waived" (internal quotation marks omitted)). During oral argument before this court, the town's counsel conceded this argument by the plaintiff and abandoned the town's challenge thereto. Our review of the summary judgment record reveals that this concession is well taken and that the town waived its statute of limitations defense to the plaintiff's nuisance claim by failing to plead it. See, e.g., *Cue Associates, LLC* v. *Cast Iron Associates, LLC*, 111 Conn. App. 107, 112, 958 A.2d 772 (2008) ("the limitations period found in § 52-577 is procedural rather than jurisdictional, and, thus, may be waived by the party entitled to the defense"). We therefore conclude, for this reason, that the court also improperly rendered summary judgment in favor of the town as to count two on the alternative ground that the plaintiff's nuisance claim was time barred by the statute of limitations set forth in § 52-577.

II

We now turn to the plaintiff's claim that the court improperly rendered summary judgment in favor of Aquarion. She argues that, in opposing Aquarion's motion for summary judgment, she provided an

evidentiary foundation that demonstrated that a genuine issue of material fact existed "as to whether Aquarion's release of water on September 25, 2018, contributed to the flooding on her property" and that the court erroneously determined otherwise. The crux of her argument is that the court, in its ruling, considered only the evidence Aquarion presented in support of its motion and did "not give any weight to [her] affidavit or the exhibits produced in support of her opposition, including topography maps and other official town and state documents." She concedes, however, that "these documents do not provide direct evidence that Aquarion's release of water directly contributed to the flooding on [the] property" but maintains that, "read in concert with [her] affidavit, [they] do create a genuine issue of material fact as to whether Aquarion may have contributed to the flooding condition." We disagree.

The record reveals that the plaintiff's expert, Wheway, who was tasked with investigating "the flash flooding event of September 25, 2018," and offering opinions regarding the causes thereof, testified at his deposition that he had not "seen any indication" that Aquarion bore any responsibility for the flooding of the property. He stated that his research revealed that all of the reservoirs Aquarion controlled in the town sat at elevations "below" the property, and he agreed that he did not "ha[ve] an opinion at all that Aquarion had any role whatsoever in this incident." Moreover, in his report, Wheway faulted the town with respect to the design, installation and maintenance of its storm drainage system and makes no reference to Aquarion, whatsoever. Indeed, he opined in his affidavit, "that the flooding at the intersection was caused by insufficient inlet capacity of the existing catch basin grates to intercept the surface flow of stormwater runoff and convey it to the piping system."

In addition, Ulrich averred in his affidavit that none of the town's reservoirs or "water impound facilities" that it controlled "could have caused water to drain over the . . . property on September 25, 2018." In particular, he

attested to the fact that the Easton Reservoir is the closest reservoir to the property and that the water released therefrom flows into the Mill River, which sits 150 feet below where the property is located.

Although the plaintiff acknowledges in her principal brief to this court that "Wheway did not link Aquarion to the property damage on [the] property," she notes that he qualified his testimony in this regard by stating that it was "based upon information that *we've accumulated at this point in time*." (Emphasis in original; internal quotation marks omitted.) To the extent the plaintiff is suggesting by this that the court acted prematurely in acting on and granting Aquarion's motion, we previously have noted that she has not raised this claim on appeal. See footnote 4 of this opinion. Even so, the record does not reflect that Wheway procured additional information following his deposition that changed his opinions as to Aquarion in any way. The mere fact that he may have left the door open to that possibility is not sufficient to call into question his testimony that all of the reservoirs Aquarion controlled in the town sat at elevations below the elevation of the property and that he had not "seen any indication" that Aquarion bore any responsibility for the flooding of the property, let alone create a genuine issue of material fact in these regards. See, e.g., *Adams* v. *Aircraft Spruce & Specialty Co.,* supra, 215 Conn. App. 441. The plaintiff misapprehends the summary judgment standard. She must demonstrate *with evidence*, not supposition, the existence of a disputed material fact. See, e.g., *Cazenovia Creek Funding I, LLC* v. *White Eagle Society of Brotherly Help, Inc., Group 315, Polish National Alliance,* 351 Conn. 722, 731, 333 A.3d 508 (2025) ("[t]o oppose a motion for summary judgment successfully, the nonmovant must recite specific facts . . . [that] contradict those stated in the movant's affidavits and documents" (internal quotation marks omitted)).

The plaintiff also maintains that she has established, by way of her own affidavit, that such a question exists "by stating that water from Aquarion's other facilities

does cross [the] property" and "stat[ing] that the topography map of the area is misleading as it doesn't clearly show the contours of the surface in the area. The fact is that [the town's] reservoir is above [the property], not below it." These conclusory statements by the plaintiff, however, do not constitute evidence sufficient to establish the existence of disputed material facts. See *Gupta* v. *New Britain General Hospital*, 239 Conn. 574, 583, 687 A.2d 111 (1996); see also *Begley* v. *State*, supra, 234 Conn. App. 828 ("[m]ere statements of legal conclusions . . . and bald assertions, without more, are insufficient to raise a genuine issue of material fact capable of defeating summary judgment"); *Bozelko* v. *Webster Bank, N.A.,* 159 Conn. App. 821, 829, 123 A.3d 1250 ("plaintiff's self-serving affidavit insufficient to surmount motion for summary judgment"), cert. denied, 320 Conn. 910, 128 A.3d 954 (2015). We conclude, therefore, that there were no genuine issues of material fact as to whether Aquarion's conduct contributed to the flooding of the property on September 25, 2018.

## III

The plaintiff also claims that the court abused its discretion in denying her motion to reconsider the granting of Aquarion's motion for summary judgment. She argues that the court "overlooked or misapprehended the facts" by failing to give weight to her affidavit and reading it "in concert" with the other exhibits she submitted in support of her opposition to Aquarion's motion for summary judgment. Because we conclude that the court properly granted Aquarion's motion for summary judgment, we need not review the propriety of its denial of the plaintiff's motion for reconsideration. See *Bozelko* v. *Webster Bank, N.A.*, supra, 159 Conn. App. 830 ("[b]ecause we conclude that the defendant's motion for summary judgment properly was granted, there is no need for us to review the appropriateness of the court's denial of the plaintiff's motion for reconsideration"); *Valentine* v. *LaBow,* 95 Conn. App. 436, 452–53, 897 A.2d 624 ("[b]ecause we conclude that [the] motion for summary

judgment properly was granted, the court did not abuse its discretion in denying the defendant's motion to reconsider or her motion to reargue"), cert. denied, 280 Conn. 933, 909 A.2d 963 (2006); *Vogel* v. *Maimonides Academy of Western Connecticut, Inc.,* 58 Conn. App. 624, 631, 754 A.2d 824 (2000) ("[b]ecause we conclude that the motion for summary judgment properly was granted, the court did not abuse its discretion in denying the plaintiff's motion to reargue and for reconsideration").

In sum, we conclude that the court properly determined that the plaintiff's negligence claims against the town and Aquarion failed as a matter of law and, accordingly, properly rendered summary judgment as to counts one and three of the plaintiff's complaint. We further conclude, however, that the court improperly determined, at this stage of the proceedings, that there was no genuine issue of material fact as to whether the plaintiff's nuisance claim against the town is barred by the doctrine of governmental immunity.

The judgment is reversed with respect to count two of the third amended complaint and the case is remanded with direction to deny the town's motion for summary judgment as to count two and for further proceedings on that count according to law; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.